IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

**Alexandria Division**

| | | |
|---|---|---|
| Marcus Lamont Cooper, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:20cv280 (RDA/TCB) |
| | ) | |
| Sheriff J. Williams, | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Marcus Lamont Cooper ("Plaintiff"), a Virginia inmate proceeding pro se, filed a civil

rights complaint pursuant to 42 U.S.C. § 1983, alleging that his Eighth Amendment rights were

violated by defendant Williams because excessive force was used to extract him from his cell at

the Norfolk City Jail, and he was denied medical treatment for injuries that occurred during the

cell extraction. Following several screenings, Plaintiff's fifth amended complaint ("operative

complaint") was served on the remaining defendant, Cpl. Williams ("Williams" or "Defendant").

[Dkt. Nos. 34, 42].[1] Williams has filed a motion for summary judgment, supported by exhibits.

[Dkt. Nos. 55, 56, 56-1 through 10, 58]. Plaintiff has been afforded the opportunity to file

responsive materials pursuant to Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975) [Dkt. No.

57], but he has not responded. Accordingly, this matter is now ripe for disposition. For the

reasons that follow, Williams' motion for summary judgment must be granted.

### I. Plaintiff's Operative Complaint

On January 21, 2020, Plaintiff was transported from the Hampton Roads Regional Jail

("HRRJ") to the Norfolk City Jail in connection with a "fresh charge" issued by a Norfolk

magistrate. [Dkt. No. 34 at 1]. Cooper was "angry and mad about the new charge" and he asked

---

[1] The amended complaint named only one defendant, Williams. [Dkt. No. 34 at 2-3]; see also Dkt. No. 16 at 1-2.

several unnamed Norfolk sheriff's deputies to contact the HRRJ to arrange his transfer back to that facility. [Id.]. Plaintiff refused to have his fingerprints taken at the Norfolk City Jail, kicked his cell door, and struck the sprinkler head inside his cell.

Plaintiff alleges he ceased his disruptive behavior, and afterwards five deputies, including Williams, approached his cell. One deputy was armed with a "cannon-gun," and another deputy held a shield. The deputies opened Plaintiff's cell door and started to enter. Plaintiff alleges he was confined in leg shackles, held his hands out to be handcuffed,  did not resist the deputies or charge toward the open door, and posed "no threat" to the deputies. Nevertheless, Williams shot at Plaintiff five times, striking him twice in the head and causing an injury to his ear. Plaintiff alleges that after Williams shot Plaintiff, Williams and another deputy placed Plaintiff in a restraint chair and returned him to his holding cell. Plaintiff claims that although he asked Williams repeatedly to see a doctor, he did not receive medical treatment until he was returned to the HRRJ. [Id.]. Plaintiff was released from incarceration at the HRRJ on October 16, 2020. [Dkt. No. 38].

Plaintiff contends that on January 21, 2020, during the approximately three hours he was at the Norfolk City Jail, that Williams used excessive force in violation of the Eighth Amendment and that Williams was deliberately indifferent to his serious medical needs because he denied him medical care. [Dkt. No. 34 at 1]. Williams admits he and four other deputies entered the cell to restrain Plaintiff because he was disruptive and he had dislodged the cover on the sprinkler system, which created a potential safety issue for the jail. The evidence in support of the motion for summary judgment establishes that Plaintiff did not file a grievance with the Norfolk City Jail regarding the events of January 21, 2020, and that he was disruptive,

combative, was not restrained in leg shackles, and refused medical treatment when offered. The evidence includes a video of the events, which supports the Defendant's position.

## II. Undisputed Statement of Facts

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Defendant, pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56, sets forth a statement of material facts that Defendant contends are undisputed. Plaintiff has not complied with his obligations under those Rules by submitting statements of undisputed and disputed facts. Accordingly, Plaintiff has failed to rebut any of the facts set forth in Defendant's motion for summary judgment, Gholson v. Murray, 953 F. Supp. 709, 714 (E.D. Va. 1997), and the Court accepts Defendant's statement of facts as true. See Integrated Direct Mktg., LLC v. May, 129 F. Supp. 3d 336, 345 (E.D. Va. 2015) ("In determining a motion for summary judgment, the Court may assume that facts identified by the moving party in its listing of material facts are admitted, unless such a fact is controverted in the statement of genuine facts in opposition to the motion.") (quoting E.D. Va. Loc. Civ. R. 56(B)), aff'd, 690 F. App'x 822 (4th Cir. 2017); see also JDS Uniphase Corp. v. Jennings, 473 F. Supp. 2d 705, 707 (E.D. Va. 2007) (finding that movant's statement of undisputed facts is deemed admitted where nonmovant's response fails to "identify with any specificity which facts, if any, were disputed") (citing E.D. Va. Loc. Civ. R. 56(B)).[2]

1. On January 21, 2020, Plaintiff, a pretrial detainee at the HRRJ, was brought to the

---

[2] The record of admissible evidence includes Defendant's affidavits and exhibits. [Dkt. Nos. 56-1 through 56-10]. Neither the original complaint nor any of Plaintiff's amended complaints were verified, and Plaintiff has not responded to the motion for summary judgment. See Goodman v. Diggs, 986 F.3d 493, 498-99 (4th Cir. 2021) (noting that verified pleadings are the "equivalent of an affidavit"). The video of the incident is included as an exhibit, [Dkt. No. 56-6], and was provided to Plaintiff as well. For context, the "Undisputed Facts" also includes reference to Plaintiff's admission that he was a pretrial detainee and that he was treated and released by Sentara Norfolk General Emergency Department on January 21, 2020. [Dkt. No. 25 at 1, 4-6].

Norfolk Jail to be booked on newly filed charges. [Dkt. Nos. 26 at 1; 56-1 at ¶ 6].

2. Plaintiff was wearing a red HRRJ-issued jumpsuit when he arrived at the Norfolk Jail. It is well known among Norfolk Sheriff's deputies that HRRJ uses red jumpsuits to designate inmates who are chronically disruptive or otherwise pose a security risk. [Id. at ¶ 7].

3. Williams has worked for the Norfolk Sheriff's Office ("NSO") since October 2004. In January 2020, Williams was a member of the NSO's sworn staff with the rank of corporal, and was assigned as the supervisor of the "Booking Area B Team." In this role, Williams was responsible for, among other duties, maintaining the safety and security of the Booking Area and supervising the other deputies assigned to the Booking Area. [Id. at ¶¶ 2-5].

### Relevant NSO Policies

4. The NSO administrative grievance policy is intended to provide "fair resolution to inmate concerns and issues." The grievance policy is set forth in the NSO's Inmate Handbook ("Handbook"), a copy of which is provided to all inmates held at the Norfolk Jail.[3] The policy is also memorialized in NSO Policy & Procedure 7-703. [Dkt. Nos. 56-2 at ¶¶ 11-13; 56-3, 56-4].

5. Under the policy, inmates may grieve a variety of matters, including actions of NSO employees they view as improper. Additionally, a problem posing an immediate threat to an inmate's "life, health or safety" can be addressed by an Emergency Grievance, which requires immediate action by NSO personnel. [Dkt. No. 56-4 at 1-5].

6. Grievance forms are available to all inmates. Before submitting a Grievance, an inmate must attempt to resolve the issue to be grieved with a floor deputy or floor supervisor and, if the

---

[3] The Handbook states that each inmate is provided a copy of the Handbook and that the inmate will be required to sign a form (Cf #89-1R) acknowledging that they have read and understand the grievance "process, policy and procedures...." [Dkt. No. 56-4 at 1-2]. Defendant did not attach a form executed by Plaintiff and there is no indication on the video that Plaintiff had any documents other than the warrants that were served with him in the holding cell. Plaintiff, however, has not denied the evidence in support of the motion for summary judgment that asserts he, as an inmate in the Norfolk City Jail, was given a Handbook.

floor officers cannot assist, with the Team Commander. If the problem cannot be resolved amicably by any of these officers, the Team Commander will provide a Grievance form to be completed and returned by the inmate. [Id. at 2].

7. Standard Grievances are addressed and responded to in writing by NSO personnel within seven days after submission. Responses to Emergency Grievances are provided within twenty-four hours after submission. [Id. at 3].

8. If an inmate is dissatisfied with the response he receives to a Grievance or an Emergency Grievance, he may appeal the response by requesting, completing, and submitting a Grievance Appeal Form within five days after receiving the initial response. Responses to appeals are also provided within five days following submission. [Id. at 4-5].

9. If an inmate is dissatisfied with the results of an initial Grievance Appeal, he may appeal the decision further. [Id. at 5].

10. Copies of all inmate Grievances, Emergency Grievances, and Grievance Appeals are retained by the NSO for a period of three years after submission. [Id. at 6].

11. The NSO's administrative grievance policy, as described above, was in effect in January 2020. [Dkt. No. 56-2 at ¶ 13]

12. The NSO's policies governing the use of force by staff against inmates are set forth in Policy & Procedure 4-406. [Dkt. Nos. 56-2 at ¶ 14; 56-4 at 7-9].

13. NSO sworn staff are permitted to use force for a variety of reasons, including "to protect themselves, other persons, prevent an escape, affect an arrest or obtain prisoner compliance with orders." The degree of force used must be reasonable under the circumstances. [Dkt. No. 56-2 at ¶ 15].

14. The NSO policy includes a "Continuum of Force," under which, in January 2020, use of a pepper ball gun and other non-lethal weapons was appropriate where an inmate exhibited "combative behavior," to include aggressive actions towards officers, strongly offensive behavior, and any conduct that "may cause physical injury." Further, the use of "restraint" was, and is, considered appropriate where an inmate exhibits "resistance," which includes situations where an inmate is "generally [but not entirely] cooperative in response to [officer] direction." [Dkt. Nos. 56-1 at ¶¶ 17, 20; 56-2 at ¶¶ 16-17, 19].

**Events of January 21, 2020**

15. Plaintiff arrived at the Norfolk Jail around noon on January 21, 2020, and was placed in Holding Cell H8 within the Booking area. He remained in his cell until approximately 1:05 p.m. (13:05), at which point he was taken for fingerprinting by Dep. Stephen Brown and a female deputy. [Dkt. Nos. 56-1 at ¶¶ 6, 8-9; 56-5 at ¶ 3; 56-6 at 13:05[4]].

16. Plaintiff was uncooperative throughout the fingerprinting process, and used insulting and profane language toward the deputies. When asked if he would allow the deputies to take his fingerprints, Plaintiff not only refused, but sexually harassed the female deputy by indicating that he would only allow his fingerprints to be taken if she performed oral sex on him. Williams witnessed this interaction and determined that the fingerprinting process could not be completed. He directed the deputies to return Plaintiff to his holding cell. [Dkt. Nos. 56-1 at ¶ 10; 56-5 at ¶ 4; Video at 13:05-13:06].

17. Plaintiff continued to be combative and disruptive after returning to his cell. He yelled at deputies in the vicinity, including Williams, and threatened to throw things at them and

---

[4] The video footage is about two hours long and a significant portion of it depicts Plaintiff alone in his cell before the incident involving Williams and the other deputies occurred. The time reference is an approximate time marker of significant events relevant to the claims. References to the video footage will be designated as "Video at __:__," which refers to the time marker on the video.

6

flood the jail. Additionally, Plaintiff stood on his bunk and tampered with the ceiling mounted sprinkler head in his cell on several occasions; and he kicked the bars and plexiglass on his cell door several times, ultimately cracking the plexiglass. [Dkt. Nos. 56-1 at ¶ 11; 56-5 at ¶ 5; 56-7 at ¶¶ 4-5; Video at 13:06-13:38].

18. Plaintiff also demanded that the deputies in the Booking Area contact HRRJ personnel to arrange his transport back to the HRRJ. Williams personally called the HRRJ several times per Plaintiff's requests, though it took Williams over half an hour to reach anyone at the facility. [Dkt. Nos. 56-1 at ¶ 12; Dkt. No. 56-5 at ¶ 6].

19. Eventually, Plaintiff began striking the sprinkler head with his hands and fists. [Dkt. No. 56-1 at ¶ 13; 56-5 at ¶ 7; Video at 13:38-13:41].

20. Throughout Plaintiff's various disruptions, Williams and other deputies gave verbal commands to Plaintiff to stop tampering with the sprinkler, to stop yelling, to stop kicking his cell door, and to calm down. The deputies also explained to Plaintiff that HRRJ officers were on their way. [Dkt. Nos. 56-1 at ¶ 14; 56-5 at ¶ 8; 56-7 at ¶¶ 4-5; Video at 13:40- 13:41].

21. Plaintiff responded to the deputies' commands with more profane insults. He, again, threatened to throw things at Williams, and his disruptive behavior continued. Ultimately, Plaintiff struck the sprinkler head so forcefully that he loosened the protective collar surrounding it. [Dkt. Nos. 56-1 at ¶ 15; 56-5 at ¶¶ 9-10; 56-7 at ¶¶ 4-5; Video at 13:40-13:41].

22. Damage to a sprinkler head can disrupt the jail's entire sprinkler system, resulting in the uncontrolled disbursement of water, flooding, and costly damage to jail property and equipment. [Dkt. Nos. 56-1 at ¶ 16; 56-2 at ¶ 21].

23. Under NSO policy, deputies can and should restrain uncooperative and combative inmates, especially when their conduct poses a risk of harm to persons or property. In light of

Plaintiff's ongoing misconduct, which, at that point, had lasted more than half an hour, and the serious risk of flooding that Plaintiff presented, Williams determined that it was necessary to remove Plaintiff from his cell and place him in a restraint chair until he calmed down and exhibited a willingness to follow orders. [Dkt. Nos. 56-1 at ¶ 17; 56-2 at ¶ 19].

24. Williams assembled a team of deputies in the Booking Area to extract Plaintiff from his cell, including, in addition to Williams, Deputies Stephen Brown, Ralph Jones, Danielle Sykes, and Brian Hall (collectively the "Extraction Team"). [Dkt. Nos. 56-1 at ¶ 18; 56-5 at ¶ 11; 56-7 at ¶ 6; 56-8 at ¶¶ 2-3].

25. In light of Plaintiff's threats and physical combativeness, Williams determined that some members of the Extraction Team should be armed with non-lethal defensive weapons. Accordingly, Dep. Brown obtained a "shock shield," and Williams retrieved the pepper ball gun stored in the Booking Area. [Dkt. Nos. 56-1 at ¶ 19; 56-5 at ¶ 12; 56-7 at ¶ 6; 56-8 at ¶ 3].

26. A pepper ball gun is a non-lethal kinetic impact weapon commonly used in correctional facilities nationwide to control combative inmates. Under the version of NSO Policy and Procedure 4-406 in effect in January 2020, use of a pepper ball gun was specifically authorized to control an inmate exhibiting combative behavior. Based on Plaintiff's ongoing misconduct (threatening staff, disregarding commands to calm down, and damaging jail property) and the aforementioned provision of Policy and Procedure 4-406, Williams determined that it was appropriate to arm himself with the pepper ball gun in this instance. [Dkt. Nos. 56-1 at ¶ 20; 56-2 at ¶¶ 17-18, 22; 56-4 at 7, 9].

27. Typically, a pepper ball gun is loaded with "pepper balls," small plastic capsules filled with an eye irritant that burst upon impact. At the time of this incident, Williams's gun was equipped with "water rounds," small plastic capsules filled with water instead of an irritant that

8

also burst on impact. Both forms of ammunition – pepper balls and water rounds – are not designed to inflict serious physical harm and are capable of causing only minor lacerations or contusions upon impact to most areas of the body. [Dkt. Nos. 56-1 at ¶ 21; 56-2 at ¶ 18].

28. Williams's decision to place Plaintiff in a restraint chair and to assemble a team of deputies and utilize a shock shield and pepper ball gun to extract Plaintiff from his cell were appropriate under NSO protocol. [Dkt. Nos. 56-1 at ¶¶ 17-20; 56-2 at ¶ 22; 56-4 at 7, 9].

29. The Extraction Team approached Plaintiff's cell at approximately 1:41 p.m. [Video at 13:41]. At least three times, Williams loudly and clearly commanded Plaintiff to put his hands behind his back, move to the rear of his cell, and face the back wall. In response, Plaintiff threatened the deputies, and told them to come in because he "had something for [them]." All the while, Plaintiff swung his arm up and down in a threatening manner. [Dkt. Nos. 56-1 at ¶ 22; 56-5 at ¶ 13; 56-7 at ¶ 7; 56-8 at ¶ 3; Video at 13:41-13:42].

30. Plaintiff was not wearing leg shackles at this time or at any point prior to the cell extraction. [Dkt. Nos. 56-1 at ¶ 23; 56-5 at ¶ 14; 56-7 at ¶ 8; 56-8 at ¶ 4; Video at 13:41-13:42].

31. After Plaintiff disregarded Williams's series of commands, Williams directed Dep. Sykes to open the door to Plaintiff's cell. As the door opened, Williams was in the front of the Extraction Team, directly facing Plaintiff. Williams yelled at Plaintiff, "Get down! Get down! Get to the back! Put your hands behind your back!" Despite these commands, Plaintiff raised his left hand in Williams's direction and turned his face to the right, while continuing to look at the officers through a side glance. Plaintiff then jerked forward and toward Williams abruptly. [Dkt. Nos. 56-1 at ¶¶ 24-25; 56-5 at ¶ 15; 56-7 at ¶¶ 9-10; 56-8 at ¶ 5; Video at 13:41-13:42].

32. As Dep. Sykes opened the cell door, Plaintiff "looked as though he was going to come towards [the deputies] in an angry manner." [Dkt. No. 56-7 at ¶ 9].

9

33. Williams believed Plaintiff's lunge forward with his hand raised was an attempt to grab the pepper ball gun's barrel. Had he been able to disarm Williams, Plaintiff could have overpowered one or more of the deputies and/or fled unrestrained from his cell. Thus, the safety of all of the responding deputies as well as the security of the facility were threatened at this moment. [Dkt. Nos. 56-1 at ¶ 26; 56-2 at ¶ 23; 56-5 at ¶ 15].

34. Williams responded to Plaintiff's aggressive lunge by firing three-four water rounds from the pepper ball gun, aiming for Plaintiff's left upper arm and shoulder. [Dkt. Nos. 56-1 at ¶ 27; 56-5 at ¶ 16; 56-7 at ¶ 11; 56-8 at ¶ 6; Video at 13:41-13:42].

35. Under NSO protocol, Policy & Procedure 4-406, Williams's discharge of the pepper ball gun was entirely reasonable and justified under the circumstances. Indeed, Williams's purpose in firing the gun was to protect himself and others in the vicinity and to restore order in the jail by subduing the Plaintiff. [Dkt. Nos. 56-1 at ¶ 28; 56-2 at ¶¶ 23-24; 56-4 at 7, 9].

36. After Williams discharged his weapon, Plaintiff retreated to the back of his cell. Williams followed, leading the other deputies with his gun raised, but he did not fire any additional rounds. Plaintiff was subdued, and Deps. Sykes and Jones handcuffed him behind his back. Once it was clear that Plaintiff was under control, Williams exited the cell with the pepper ball gun. The remaining members of the Extraction Team escorted Plaintiff out of the cell shortly thereafter. [Dkt. Nos. 56-1 at ¶¶ 29-30; 56-5 at ¶ 17; 56-7 at ¶¶ 12-13; 56-8 at ¶ 7; Video at 13:41-13:43].

37. Plaintiff was then placed in a restraint chair by other members of the Extraction Team, while Williams observed. At this point, given Plaintiff's repeated disruptive conduct, culminating in the need to forcibly remove him from his cell, Williams and the other members of the Extraction Team reasonably and justifiably believed that it was still necessary to employ the

10

restraint chair to control him. Indeed, Plaintiff had exhibited a willingness to destroy jail property

from inside his holding cell, so allowing him to move freely, even within the confines of a cell,

was no longer a safe and secure option for detaining him. [ Dkt. Nos. 56-1 at ¶ 31; 56-5 at ¶ 18;

56-7 at ¶ 14; 56-8 at ¶ 8; 56-2 at ¶ 25].

38. Plaintiff was initially uncooperative and continued to use profane language while the

deputies were securing him in the restraint chair. Eventually, however, the deputies were able to

secure him in the chair. [Dkt. Nos. 56-1 at ¶ 32; 56-5 at ¶ 18; 56-7 at ¶ 14; 56-8 at ¶ 8].

39. Plaintiff did not ask to see a doctor at any point. However, shortly after Plaintiff was

placed in the restraint chair, Williams, Dep. Brown, and Dep. Jones noticed a small laceration on

Plaintiff's left ear. Williams deduced that one of the water rounds had ricocheted off Plaintiff's

left arm or shoulder and struck his ear. [Dkt. Nos. 56-1 at ¶ 33; 56-5 at ¶ 19; 56-8 at ¶ 9].

40. Williams immediately asked Nurse Traino, the NSO nurse on-duty in the Booking

Area, to examine Plaintiff. [Dkt. Nos. 56-1 at ¶ 34; 56-5 at ¶ 9; 56- 9 at ¶ 3].

41. Nurse Traino attempted to examine Plaintiff in the restraint chair, but Plaintiff refused

to allow her to touch him, again using profane and sexually harassing language. [Dkt. Nos. 56-1

at ¶ 35; 56-5 at ¶ 20; 56-8 at ¶ 10; 56-9 at ¶ 4].[5]

42. Nurse Traino determined that Plaintiff had refused treatment. She filled out a Refusal

of Treatment form accordingly. Williams determined that Plaintiff should not sign the refusal

form in this instance because he could have used a writing utensil as a weapon. [Dkt. Nos. 56-1

at ¶¶ 36-37; 56-9 at ¶ 5; 56-10].

43. Plaintiff was returned to Holding Cell H8 in the restraint chair at 1:48 p.m. [Video at

13:48]. He did not appear to be injured or in pain. In fact, he sat calmly in the restraint chair for

---

[5] Plaintiff admits in his amended complaint that the HRRJ personnel had him transported to an emergency room where he was treated and released on January 21, 2020. [Dkt. Nos. 34 at 1; 31 at 6-8].

several minutes. At approximately 1:53 p.m., Plaintiff became combative again, yelling and moving around forcefully in the chair, as if trying to free himself. After a few moments, however, Plaintiff resumed a calm demeanor and began mocking the booking staff with other inmates in the area. [Dkt. No. 56-1 at ¶ 38; Video at 13:48-14:05].

44. Plaintiff was kept in the restraint chair for approximately an hour and was released once HRRJ officers arrived to pick him up. When officers from the HRRJ arrived to retrieve him, Plaintiff's behavior markedly changed, and he became entirely cooperative. Plaintiff was escorted out of the Norfolk Jail shortly before 3:00 p.m. on January 21, 2020. [Dkt. Nos. 56-1 at ¶ 39; 56-7 at ¶ 15; Video at 14:52].

45. It is NSO policy that barring special circumstances, an inmate should not be kept in a restraint chair for more than two hours. Accordingly, Williams and the other deputies on duty would have released Plaintiff within two hours even if the HRRJ officers had not arrived. [Dkt. Nos. 56-1 at ¶ 40; 56-7 at ¶ 16; Video at 14:52].

46. At the time he filed his Amended Complaint, Plaintiff was still incarcerated at the HRRJ. [Dkt. No. 34 at 2].

47. Plaintiff did not submit a Grievance or Emergency Grievance regarding the events of January 21, 2020, to the NSO prior to filing his Amended Complaint. [Dkt. No. 56-2 at ¶¶ 26-27].

## II. Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of proving that judgment on the pleadings is appropriate, i.e., that no genuine issues of material fact are present for resolution. See Celotex

12

Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The facts which a moving party bears the burden of proving are those which are material: materiality is dictated by "the substantive law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

Once a moving party has met its burden of proof, the non-moving party must produce specific facts to generate a disputed issue for trial. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). The court will view the evidence and draw all reasonable inferences in the light most favorable to the non-moving party. Porter v. U.S. Alumoweld Co., 125 F.3d 243, 245 (4th Cir. 1997). Nevertheless, "[o]nly disputes over facts which might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248.

The non-moving party may not defeat a properly supported summary judgment motion by simply substituting the "conclusory allegations of the complaint or answer with conclusory allegations of an affidavit." Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 888 (1990). This applies even where the non-moving party is a pro se prisoner. Campbell-El v. Dist. of Columbia, 874 F. Supp. 403, 406-07 (D.D.C. 1994); see also Local Civil Rule 7(K)(3) (to defeat a dispositive motion, a pro se party "must identify all facts stated by the moving party with which the pro se party disagrees and must set forth the pro se party's version of the facts by offering affidavits ... or by filing sworn statements. Unsupported speculation is not enough to withstand a motion for summary judgment. See Ash v. United Parcel Serv., Inc., 800 F.2d 409, 411-12 (4th Cir. 1986). Similarly, "[t]he mere existence of some alleged factual dispute" cannot defeat a motion for summary judgment; the dispute must be both "material" and "genuine," meaning that it "might affect the outcome of the suit under the governing law." Hooven-Lewis v. Caldera, 249 F.3d 259, 265 (4th Cir. 2001) (emphasis omitted).

13

Defendant Williams moves this Court to enter summary judgment because Plaintiff did not exhaust his administrative remedies. In the alternative, he moves this Court to enter summary judgment in his favor because the force used to extract Plaintiff from his cell was an appropriate response to Plaintiff's disruptive behavior, threats of physical harm, and his attempts to damage the sprinkler system at the jail; and that Defendant Williams was not deliberately indifferent to Plaintiff's alleged serious medical need.

### III. Exhaustion of Administrative Remedies

The Prison Litigation Reform Act ("PLRA") provides that "[n]o action shall be brought with respect to prison conditions under § 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "[T]he PLRA's exhaustion requirement is mandatory," Anderson v. XYZ Corr. Health Servs., Inc., 407 F.3d 674, 677 (4th Cir. 2005) (citing Porter v. Nussle, 534 U.S. 516, 524 (2002)), and an "untimely or otherwise procedurally defective administrative grievance" does not satisfy the PLRA's exhaustion requirement. Woodford v. Ngo, 548 U.S. 81, 83-84 (2006). Exhaustion is required even if the administrative remedies do not meet federal standards, are not "plain, speedy, and effective," and even if the relief sought is not available via the grievance process, such as monetary damages. Porter, 534 U.S. at 524. To properly exhaust, thereby giving the agency a full and fair opportunity to adjudicate a plaintiff's claims, the plaintiff must adhere to the agency's deadlines and procedural rules. Woodford, 548 U.S. at 89-90.

The PLRA also "mandates that an inmate exhaust [his] administrative remedies ... *before* bringing a suit to challenge prison conditions." Ross v. Blake, 136 S. Ct. 1850, 1854-55 (2016) (quoting 42 U.S.C. § 1997e(a)) (emphasis added); see also Graham v. Gentry, 413 F. App'x 660,

14

662-63 (4th Cir. 2011) ("[The PLRA requires an inmate] to exhaust any 'available' administrative remedies *before* pursuing a § 1983 action in federal court.") (emphasis added). The requirement that a prisoner exhaust before filing in court "allow[s] a prison to address complaints about the program it administers before being subjected to suit, reduc[es] litigation to the extent complaints are satisfactorily resolved, and improv[es] litigation that does occur by leading to the preparation of a useful record." Porter, 534 U.S. at 519.

Here, the Defendant avers that under the NSO policy, Plaintiff was given a copy of the Handbook outlining the grievance procedure. The evidence accompanying the motion for summary judgment, however, does not establish that this policy was carried out. For instance, the Handbook indicates that a form is used to establish that each inmate is given a Handbook, but the affidavit submitted by the Defendant on the grievance policy and procedures does not mention such a form. Yet the PLRA's exhaustion requirement extends to "'such administrative remedies as are available'" to a prisoner before he sues "over prison conditions." *Booth v. Churner*, 532 U.S. 731, 733-34, (2001) (quoting 42 U.S.C. § 1997e(a)). Under such circumstances, this portion of the motion for summary judgment will be denied without prejudice.

### IV. Excessive Use of Force

The Eighth Amendment proscribes "the unnecessary and wanton infliction of pain." Hudson v. McMillian, 503 U.S. 1, 5 (1992). However, not every malevolent touch amounts to a constitutional violation. Id. at 9. The Defendant's motion for summary judgment states it is unclear whether Plaintiff was a pretrial detainee while in the Norfolk City Jail on January 21, 2020. The Plaintiff alleged he was a pretrial detainee at the time of the cell extraction, and that is supported by the fact that he was being served with a new charge at the Norfolk City Jail. For purposes of the Defendant's motion, Plaintiff will be considered a pretrial detainee.

Excessive force claims brought by pretrial detainees fall under the ambit of the Fourteenth Amendment's Due Process clause, because a state official does not technically have the authority to "punish" an un-convicted detainee. See Coney v. Davis, 809 F. App'x 158, 159 (4th Cir. 2020) (citing Kingsley v. Hendrickson, 576 U.S. 389, 400-01 (2015)). Thus, in determining whether the use of force against a pretrial detainee was "excessive" under Kingsley, the Court need only consider whether the force "was objectively unreasonable." 576 U.S. at 397. "[O]bjective reasonableness turns on the 'facts and circumstances of each particular case.'" Id. (quoting Graham v. Connor, 490 U.S. 386, 396 (1989)). This inquiry turns on the facts and circumstances of the individual case with a consideration of the "perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." Id.[6]

Several factors prove particularly pertinent to this inquiry, including: (1) the relationship between the need for the force and the amount of forced used; (2) the extent of the plaintiff's resulting injury; (3) efforts made by the acting officer to "temper or limit" the amount of force used; (4) the severity of the security problem at hand; (5) the threat posed as reasonably perceived by the officer; and (6) whether the plaintiff was actively resisting. Id. While not an exhaustive list, the factors Kingsley identified constitute an appropriate starting point for the kinds of considerations that the Court must make in its excessive force determination. Id. Further, many of the factors considered when analyzing the subjective component of the Eighth

---

[6] A court must also account for the "legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained," appropriately deferring to "policies and practices that in th[e] judgment" of jail officials "are needed to preserve internal order and discipline and maintain institutional security." Bell v. Wolfish, 441 U.S. 520, 540 (1979). The Fourth Circuit has noted that federal courts "must accord due deference to an officer's efforts" to restrain a detainee "either to calm the general environment or to prevent [the detainee] from hurting himself" in order to not "encourage[] ... insubordination in an environment which is already volatile enough." Grayson v. Peed, 195 F.3d 692, 697 (4th Cir.1999).

Amendment test also constitute factors under the Fourteenth Amendment objective

unreasonableness test. See Mays v. Sprinkle, 992 F.3d 295, 300 (4th Cir. 2021) (observing that

courts have "traditionally looked to Eighth Amendment precedents" as guidance when

considering Fourteenth Amendment claims).

Here, the video[7] clearly shows that Plaintiff was disruptive for an extended period of

time, repeatedly refused to calm down or obey the deputies' orders, and that Plaintiff threatened

the officers and acted in an aggressive manner when the deputies were preparing to enter the

cell—especially his statement to the deputies that he had something for them. Plaintiff was also

trying to damage the sprinkler head in his cell, which would have caused flooding in the building

and posed a safety as well as a security concern. Importantly, for the first and third factors under

Kingsley, Defendant Williams only fired four water-filled balls at Plaintiff's shoulder, and he

stopped firing after Plaintiff retreated in his cell. This was a tempered use of non-lethal force that

ended once Plaintiff retreated.[8]

Moreover, Williams and the other deputies were not required to wait until the sprinkler

head was busted and the cell started to flood before removing Plaintiff from the cell. See

Kingsley, 576 U.S. at 399-400 ("[A] court must take account of the legitimate interests in

managing a jail, acknowledging as part of the objective reasonableness analysis that deference to

---

[7] "In Scott v. Harris, 550 U.S. 372 (2007), the Supreme Court held that, when 'opposing parties tell two different stories, one of which is blatantly contradicted" by video evidence contained in the record, "so that no reasonable jury could believe it, a court should not adopt that version of the facts....' Id. at 380. Rather than relying on 'visible fiction' propounded by the party whose account is contradicted by the video evidence, a court should 'view[ ] the facts in the light depicted by the videotape.' Id. at 381." Sawyer v. Asbury, 537 F. App'x 283, 291 (4th Cir. 2013).

[8] The undisputed facts establish that Williams only applied physical force after lesser measures proved ineffective. As such, this case is analogous to Guitron v. Paul, 675 F.3d 1044, 1046 (7th Cir. 2012). There, the officer first ordered the inmate to "get against the wall," which the inmate refused to do. Id. at 1045. The officer bent the inmate's wrist, but still the inmate did not comply. Id. Finally, he "slammed" the inmate against the wall. Id. The Seventh Circuit did not find this use of force excessive, observing that the officer "did not use any force until [the inmate] disobeyed a command that was designed to maintain order within the prison; and, when [he] applied modest force, [the inmate] remained defiant. [The officer] did not violate the Constitution by applying additional force." Id. at 1046.

policies and practices needed to maintain order and institutional security is appropriate.");

Santiago v. Blair, 707 F.3d 984, 990 (8th Cir. 2013) (noting the "core judicial inquiry is 'whether

force was applied in a good-faith effort to maintain or restore discipline, or maliciously and

sadistically to cause harm.'"). There is no evidence that Defendant Williams's decision to extract

Plaintiff from the cell was made to "maliciously and sadistically . . . cause harm." Id. at 990.

Under the first factor, force was necessary to restore order and to prohibit the damage to

property. Danley v. Allen, 540 F.3d 1298, 1307 (11th Cir. 2008) ("[T]he need for the use of

force [was] established by the undisputed evidence that [the inmate] created a disturbance")

(quoting Bennett v. Parker, 898 F.2d 1530, 1533 (11th Cir. 1990)).

With regard to the second Kingsley factor, the extent of the Plaintiff's injury, the only

evidence in the record is that he had a small laceration to his left ear, he did not appear to be in

pain, and Plaintiff refused medical care at the Norfolk City Jail. These facts indicate the force

used was not excessive.

With regard to the fourth and fifth Kingsley factors, the severity of the problem and the

officer's perception, the facts establish that the use of force was reasonable. Plaintiff was

attempting to damage the sprinkler system, which protects the physical safety of the building and

all the inmates and deputies in the building. "Correctional officers do not have to be under

physical attack to justify the use of force; they can also use appropriate force 'to preserve internal

order by compelling compliance with prison rules and procedures.'" Shiheed v. Harding, 802 F.

App'x 765, (4th Cir. 2020) (quoting Brooks v. Johnson, 924 F.3d 104, 113 (4th Cir. 2019)).

The final factor, active resistance, is evident from the video, Plaintiff's verbal threat to

the officers to come into the cell because he had "something" for them, and his aggressive

stance. The Plaintiff's conduct posed a threat to the officers and the safety of the building and

persons in it. Williams and the other deputies acted in a reasonable manner in ending the disruption and restoring order, with minimal force. See, e.g., Danley, 540 F.3d at 1307 (holding in context of pretrial detainee's excessive force claim that the use of "pepper spray is an accepted non-lethal means of controlling unruly inmates" and that "[a] short burst of pepper spray is not disproportionate to the need to control an inmate who has failed to obey a jailer's orders"); Soto v. Dickey, 744 F.2d 1260, 1270-71 (7th Cir. 1984) (upholding the use of mace in a prisoner's cell because he refused to be handcuffed).[9]

The same analysis involves the use of the restraint chair after Plaintiff was successfully extracted. The evidence of Plaintiff's disruptive and aggressive behavior that necessitated the use of the Extraction Team justified the deputies' concern that Plaintiff should be placed in a restraint chair. Indeed, Plaintiff was "uncooperative and used profane language" while the deputies secured him in the chair [Dkt. No. 56-1 at 6], and the fact that after a few minutes of calm in the restraint chair the Plaintiff again "became combative ... yelling and moving around forcefully in the chair ... trying to free himself." [Id. at 7]. Plaintiff remained in the restraint chair for a little more than one hour, until he was picked up by HRRJ deputies at 3:00 p.m. [Id.].

Courts within this circuit have recognized that "[p]lacement of recalcitrant, disruptive, or suicidal inmates in restraint chairs as a means to maintain 'order and control' is not a violation of

---

[9] The Fourth Circuit has noted that the use of non-lethal force, such as mace, "can be constitutionally used in small quantities to 'prevent riots and escapes' or to control a 'recalcitrant inmate.'" Williams v. Benjamin, 77 F.3d 756, 763 (4th Cir. 1996) (citation omitted); see, e.g., Jones v. Shields, 207 F.3d 491, 496 (8th Cir. 2000) (limited application of a chemical agent "to control a recalcitrant inmate constitutes a 'tempered response by prison officials' when compared to other forms of force."); see also Dye v. Lomen, 40 F. App'x 993, 996 (7th Cir. 2002) (prisoner who was tasered by guards after struggling and refusing instructions was not subject to excessive force); Alana v. Rose, No. 7:18cv00420, 2019 U.S. Dist. LEXIS 231504, *12-17 (W.D. Va. June 8, 2020) (defendant fired six non-lethal "impact rounds" containing OC spray to break up a fight between inmates); Saunders v. Shaw, No. 3:15cv82, 2015 U.S. Dist. LEXIS 146472, *17-22 (E.D. Va. Oct. 28, 2015) (use of pepper spray during cell extraction was a minimal use of force that allowed inmate to be placed in restraints); Canada v. Fannin, No. 7:10cv00432, 2011 U.S. Dist. LEXIS 98551, *9-10 (W.D. Va. Sept. 1, 2011) (use of rubber bullets to quell inmate altercation was a "good-faith effort to restore prison discipline [and] is not force that exceeds that allowed by the Eighth Amendment"), aff'd, 465 F. App'x 269 (4th Cir. 2012).

the Constitution." Evans v. S.L.R. Det. Ctr., No. 4:17cv2731, 2019 U.S. Dist. LEXIS 35037, *21

(D.S.C. Jan. 24, 2019) (quoting Strickland v. Turner, No. 9:15-0275, 2018 U.S. Dist. LEXIS

50870, *68 (D.S.C. Jan. 26, 2018)), adopted by, 2019 U.S. Dist. LEXIS 33850 (D.S.C. Mar. 4,

2019); see also Benjamin, 77 F.3d at 763-64 (holding that confining a prisoner to a metal bed

frame using four-point restraints for several hours did not violate the Eighth Amendment).

Courts have also upheld use of a restraint chair for several hours did not amount to a

constitutional violation. See, e.g., Singleton v. Brown, Civil Action No. 9:15-2723, 2016 U.S.

Dist. LEXIS 195561, *51-64 (D.S.C. Sept. 14, 2016) (six hours), adopted by, 2017 U.S. Dist.

LEXIS 34337 (D.S.C. Mar. 10, 2017), aff'd, 714 F. App'x 307 (4th Cir. 2018); Morva v.

Johnson, Civil Action No. 7:09-cv-00515, 2011 U.S. Dist. LEXIS 85960, *18-20 (W.D. Va.

Aug. 4, 2011) (nineteen hours); see also Blakeney v. Rusk County Sheriff, 89 F. App'x 897, 899

(5th Cir. 2004) (holding that pre-trial detainee's rights were not violated when he was placed in

restraint chair for twenty hours after he disobeyed orders and engaged in unruly, destructive

practices, since the purpose was not punishment).

Williams's use of the restraint chair to maintain order until the HRRJ deputies arrived to

take custody of Plaintiff was objectively reasonable, tempered under the circumstances, resulted

in no injury to Plaintiff, and ensured that the disruptive and active resistance would not further

interfere with jail operations or endanger persons or property. Further, medical treatment was

available, and Plaintiff refused. Defendant's motion for summary judgment on the excessive

force claim will be granted.

### IV. Deliberate Indifference

To prevail on an Eighth Amendment claim for denial of medical care, a plaintiff must

show "acts or omissions [on the part of the defendant] sufficiently harmful to evidence deliberate

indifference to serious medical needs." Estelle v. Gamble, 429 U.S. 97, 106 (1976). As with an excessive force claim, the plaintiff is required to satisfy both an objective and a subjective element. Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008). He must "demonstrate that the [defendant] acted with 'deliberate indifference' (subjective) to [the plaintiff's] 'serious medical needs' (objective)." Id. (quoting Estelle, 429 U.S. at 104). A "serious medical need" is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Id. (citation omitted). Deliberate indifference is a "very high standard," which "requires a showing that the defendant[] actually knew of and disregarded a substantial risk of serious injury . . . or . . . actually knew of and ignored [a] serious need for medical care." Young v. City of Mt. Rainier, 238 F.3d 567, 575-76 (4th Cir. 2001) (citations omitted).

In addition, to prevail on any § 1983 claim, the plaintiff must establish that the defendant personally deprived him of his protected rights. Wilcox v. Brown, 877 F.3d 161, 170 (4th Cir. 2017) (citation omitted). In the context of Eighth Amendment claims for inadequate medical care, the Fourth Circuit has recognized that "[i]f a prisoner is under the care of medical experts . . . a non-medical prison official will generally be justified in believing that the prisoner is in capable hands." Iko, 535 F.3d at 242 (citation omitted). Accordingly, a non-medical official can only be held liable if he knowingly interferes with the provision of treatment by a medical professional or if he knows that the treatment being provided is inadequate and disregards that fact. See Goodman v. Johnson, 524 F. App'x 887, 889 (4th Cir. 2013) (citing Iko, 535 F.3d at 242).

For the purpose of this motion, the Court will assume the laceration to Plaintiff's ear constitutes an objectively serious medical need. The evidence, however, establishes that

21

Williams was not deliberately indifferent. As soon as Williams noticed the laceration on Plaintiff's ear, he alerted Nurse Traino and asked that she examine Plaintiff. Williams did nothing to prevent Nurse Traino from providing treatment. To the contrary, Plaintiff himself prevented the exam by refusing to allow Nurse Traino to touch him, cursing at her, and harassing her. Nurse Traino ultimately determined that the exam could not be completed, and as non-medical personnel, Williams was entitled to defer to that decision.[10] In sum, the record shows that Williams made an immediate and reasonable effort to ensure that Plaintiff received treatment. This behavior is antithetical to deliberate indifference. Defendant's motion for summary judgment on the deliberate indifference claim will be granted.[11]

To the extent the Court's August 3, 2021 Order requires any action or further responses from any party, that Order is vacated. And because Defendant Williams's motion for summary judgment will be granted for the reasons stated herein, his other arguments do not need to be considered.

### IV. Conclusion

For the reasons outlined above, the Defendant's motion for summary judgment [Dkt. No. 55] will be granted. An appropriate order shall issue alongside of this Memorandum Opinion.

Entered this ___24th___ day of ___August___ 2021.

Alexandria, Virginia

/s/

Rossie D. Alston, Jr.
United States District Judge

---

[10] In any event, here Plaintiff refused medical treatment and, therefore, is barred from pursuing a deliberate indifference claim — "an inmate's refusal to accept medical treatment in no way signifies a deliberate indifference to [his own] serious medical need[]." Evering v. Rielly, 98 Civ. 6718, 2001 U.S. Dist. LEXIS 15549, *34 (S.D.N.Y. Sept. 28, 2001) (collecting cases).

[11] In addition, the record establishes that HRRJ personnel transported Plaintiff to an emergency room after he was picked up on January 21, 2020, where he was treated and then released that same day. At best, this a claim of delayed treatment where Plaintiff has not established he suffered any substantial harm. See Formica v. Aylor, 739 F. App'x 745, 755 (4th Cir. 2018) (there is no Eighth Amendment violation unless "the delay results in some substantial harm to the patient," such as a "marked" exacerbation of the prisoner's medical condition or "frequent complaints of severe pain.") (citations omitted).